# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JUN GUANG XIE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14-cv-6082** |
| **v.** | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION & ORDER

The Court grants in part and denies in part Defendants' motion for summary judgment [54]. The Court grants judgment on Count II (excessive force) in favor of all Defendants. With respect to Count I (malicious prosecution), Count III (IIED), and Count IV (conspiracy), the Court grants judgment in favor of Lieutenant Forgue only. With respect to Count VI (unreasonable search/seizure), the Court grants judgment in favor of Officers Romero and Salgado. Plaintiff is entitled to a trial on his remaining claims. A status hearing is set for November 10, 2016 at 9:30 a.m. to set a trial date and resolve any remaining issues.

## STATEMENT

This case concerns the alleged malicious prosecution of Plaintiff Jun Guang Xie ("Plaintiff"). He claims that three Chicago police officers, Ronald Forgue ("Lieutenant Forgue"), Miguel Romero ("Officer Romero"), and Claudio Salgado ("Officer Salgado") (collectively "Defendants" or "the Officer Defendants"),[1] working together with numerous non-officer defendants, effectively botched a marijuana trafficking investigation by misidentifying Plaintiff

---

[1] The City of Chicago is named as a defendant for indemnity purposes, and it has joined in the motion.

as the suspect, using excessive force to arrest him, violating his Fourth Amendment rights, maliciously prosecuting him, conspiring to maliciously prosecute him, and intentionally inflicting emotional distress. Defendants now move for judgment on virtually all of Plaintiff's claims. For the following reasons, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND[2]

### I.    The Initial Investigation

On January 17, 2013, the manager at a shipping company in south-suburban Chicago informed the Sauk Village Police Department ("SVPD") that his facility received a suspicious wooden box nailed to a pallet, and that the shipper had previously sent a similar container filled with narcotics to New York. (Defs.' Facts [Dkt. # 55] ¶ 4.) The packaged was addressed to "Tom Li" at "T&T Wholesale, 2401 S. Archer" in Chicago. (*Id.* ¶¶ 12-14.)

Later that day, SVPD officers went to the shipping facility with a drug dog, which sniffed the container and indicated the presence of drugs. (*Id.* ¶¶ 5-6.) The police accordingly opened the container and discovered roughly sixty pounds of marijuana. (*Id.* ¶¶ 6-8.) Realizing that this was no small operation, the SVPD sought assistance from the Chicago Police Department, particularly Lieutenant Forgue. (*Id.* ¶ 9.) Forgue relayed this information to his commander and was given authority to run the investigation, with the assistance of other CPD officers, such as Officer Romero. (*Id.* ¶ 13; Forgue Dep. [Dkt. # 55, Ex. 2] at 40:1-42:24.) Together, Forgue, Romero, and several non-defendant officers from both the SVPD and CPD planned a "controlled delivery" of a seized container to its intended destination — 2401 S. Archer, which also happened to be Plaintiff's place of business ("Pacific Packaging"). (Defs.' Facts [Dkt. # 55] ¶¶ 12-14.)

---

[2] The following facts are undisputed unless otherwise noted.

The first attempt was made on January 21, 2013, with Lieutenant Forgue and Officer Romero posing as delivery men. (*Id.*¶ 13.) Upon arriving, Officer Romero went into the front office and told Plaintiff's receptionist that he had a delivery for Tom Li at 2401 S. Archer. (*Id.* ¶ 15.) The receptionist responded by saying that she would call Mr. Li, but despite numerous attempts, she was unable to get ahold of him. (*Id.*) In the meantime, Officer Romero explained that he had a delivery schedule to maintain, so he would check back in later. (*Id.*)

When Forgue and Romero returned, Plaintiff's receptionist again stated that she would call Tom Li and asked the two to wait, which they did. (*Id.* ¶ 16.) Yet just as they were about to give up and head back to the station, the receptionist ran after them and exclaimed, "He is coming!" (*Id.*) (She did not specify who "he" was, however, *id.*) Plaintiff arrived at the loading dock shortly thereafter. (*Id.* ¶ 17.)

## II.    The Arrest and Search

After a quick conversation with his receptionist, Plaintiff walked from the loading dock into the warehouse and returned with a forklift, where he was met by both Officer Romero and his receptionist. (*Id.*) There, Officer Romero attempted to confirm that Plaintiff was "him" (viz., Tom Li), or at least that the package was going to the right address, but what actually occurred is unclear given parties' presentation of the facts. At best, it appears that Officer Romero spoke to Plaintiff's receptionist about *something*, which she relayed to Plaintiff (apparently in Chinese), after which Plaintiff grabbed a shipping manifest from Officer Romero and signed it.[3] Then, as

---

[3] Defendants maintain that Officer Romero verified Plaintiff's identity (as "Tom Li") with the receptionist, but the cited portions of the record do not show that. Particularly, Defendants rely upon an audio-less surveillance video (which is plainly unhelpful) and Officer Romero's deposition. (*See* Defs.' Facts [Dkt. # 55] ¶ 20) (citing Arrest Video [Dkt. # 55, Ex. 19]; Romero Dep [Dkt. # 55, Ex. 3].) Officer Romero's deposition, however, reads as follows: Q: I spoke to him [Plaintiff]. I asked him if this was his package. . . . Q: Did he respond to you? A: I don't recall. . . . Q: When you spoke to him, he didn't respond to you in English, did he? A: No. . . . Q:

Plaintiff was driving the forklift into position to load the pallet, Officer Romero took off his hat (a prearranged signal), after which several non-defendant officers swarmed the area and arrested Plaintiff — an incident that ended with Plaintiff being dragged off the forklift and thrown to the ground. (Arrest Video [Dkt. # 55, Ex. 9].)

After the arrest, several officers, including Lieutenant Forgue, searched the surrounding warehouse, Plaintiff's office, and the parking garage. (Defs.' Facts [Dkt. # 55] ¶ 27.) Defendants claim this was a protective sweep performed to ensure the safety of the officers, whereas Plaintiff insists that this was, in reality, a warrantless search prohibited by the Fourth Amendment. (Disputes of fact abound in this area, however, and the issues will be addressed more fully in the analysis section.)

## III.     Post-Arrest: Plaintiff's Interrogation and Trial

After his arrest, Plaintiff was transported to the Ninth District Police Station and placed in a holding cell. (*Id.* ¶ 37.) Because of Plaintiff's (purported) inability to understand English, Officer Romero called Officer Salgado for help. (*Id.*) (Officer Salgado had taken some night classes in Chinese, Pl.'s Facts [Dkt. # 66] ¶ 27.) At this point, the parties' stories diverge somewhat. According to Officers Salgado and Romero, they interrogated Plaintiff with a mixture of Chinese and English, which Salgado translated. (*Id.* ¶¶ 38-39.) And after they read Plaintiff his *Miranda* rights, he admitted to receiving $1500 to accept packages on behalf of Tom Li, and further offered to cooperate with the police and attempt to have Tom Li pick up the package. (*Id.*) Plaintiff, in contrast, testified that he (1) never understood any questions asked of him, (2)

___

When you spoke to [the receptionist] in English, she, then, spoke to Mr. Xie in some other language, is that right? A: Yes. Q: And did Mr. Xie sign the paper? A: Yes. (Romero Dep. [Dkt. # 55, Ex. 3] at 48:3-49:21.) Plaintiff's "clarification" in his response to these facts is similarly unhelpful: he denies that Romero asked the receptionist to verify anything, but he relies on the exact same exhibits as Defendants. (*See* Pl.'s Resp. Defs.' Facts [Dkt. # 64] ¶ 20.) Thus, neither party's claims are borne out by the record.

was never read his *Miranda* rights, and (3) made no statements whatsoever, much less and admission of guilt. (Pl.'s Facts [Dkt # 66] ¶¶ 22-25.) In either case, neither the arrest report written by Officer Romero, nor any other police report made that day, documented Plaintiff's alleged admission. (*Id.* ¶ 25.) Indeed, evidence of the alleged admission would not surface until eight months later, in a supplementary report, which indicated that Plaintiff's statement was previously omitted because of an "oversight." (*See* Supp. Report [Dkt. # 55, Ex. 18] at 1.)

Shortly thereafter, and despite the apparent loss in translation between the parties, Plaintiff, the receptionist, and Officers Romero and Salgado went back to the warehouse after the interrogation and attempted contact Tom Li. (Defs.' Facts [Dkt. # 55] ¶ 44.) Again, however, they were met with no success, and Plaintiff was ultimately charged with marijuana possession (a felony charge, which was the subject of Defendants' investigation) and resisting arrest (a misdemeanor charge, filed by a non-defendant officer). (*Id.* ¶¶ 50-51.)

Roughly six months later, during the pendency of Plaintiff's felony charge, his attorney moved to quash his arrest and to suppress any statements he purportedly made to the police. (*Id.* ¶ 54.) The trial judge granted both motions, reasoning that probable cause was lacking and that Plaintiff had not been properly mirandized. (*Id.*) The charging prosecutor, however, chose to move forward with a bench trial anyway, but Plaintiff was ultimately acquitted. (*id.*)

## LEGAL STANDARD

Summary judgment is appropriate where the admissible evidence shows that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A 'genuine issue'

exists with respect to any such material fact, and summary judgment is therefore inappropriate, when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* Conversely, "where the factual record taken as a whole could *not* lead a rational trier of fact to find for the nonmoving party, there is nothing for a jury to do." *Id.* at 682 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original)). In determining whether a genuine issue of material fact exists, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *Bunn*, 753 F.3d at 682 (citing *Anderson*, 477 U.S. at 255).

## ANALYSIS

The operative complaint contains the following claims, which are against the Officer Defendants unless otherwise noted:

| | |
|---|---|
| Count I | Malicious Prosecution |
| Count II | Excessive Force (§ 1983) |
| Count III | Intentional Infliction of Emotional Distress |
| Count IV | Conspiracy (§ 1983) |
| Count VI | Fourth Amendment Search/Seizure (§ 1983) |
| Count VII | Indemnification (v. City of Chicago) |

(Am. Compl. [Dkt. # 28] at 26-35.)[4] Defendants move for judgment on all counts. The Court will first address the federal claims and then turn to those under state law.

## I.    Excessive Force

The complaint asserts that Officers Romero and Lieutenant Forgue violated Plaintiff's Fourth Amendment rights by "violently pull[ing] [him] off the forklift truck . . . and throw[ing] him to the ground causing his face to be forced into the pavement," and that Officer Salgado failed to intervene. (Am. Compl. ¶¶ 11, 26-28.) But Plaintiff has all but conceded the futility of

---

[4] There is no "Count V" in the complaint.

this claim: he admits in his response brief that Officer Salgado "was not present on the scene . . . [and therefore] cannot be held liable," and that neither Officer Romero nor Lieutenant Forgue physically arrested him. (Pl.'s Br. [Dkt. # 65] at 19.) Accordingly, Defendants are necessarily beyond the ambit of an excessive force claim. *See Early v. Bruno*, No. 00 C 4339, 2002 U.S. Dist. LEXIS 14775, at *9 (N.D. Ill. Aug. 6, 2002) (granting summary judgment on an excessive force claim where it was undisputed that the defendant officer did not physically arrest the plaintiff).

Nonetheless, Plaintiff tries to expand Forgue's and Romero's liability by claiming that they too failed to intervene — a procedurally and substantively problematic move. In terms of procedure, Plaintiff has never before alleged that Forgue or Romero failed to intervene, and his present argument amounts to an attempt to amend his complaint through a response brief, which is impermissible. *See Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002). ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") Moreover, even if this argument were properly raised, it would still fail because a failure-to-intervene claim requires, among other things, that a defendant have a realistic opportunity to intervene in the violation of another's constitutional rights, which is not the case here. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) ("A 'realistic opportunity' means a chance to warn the officer using excessive force to stop.").

Consider the sole factual allegation of excessive force in the complaint — "[Plaintiff] was . . . violently pulled of the forklift truck . . . and thrown to the ground causing his face to be forced into the pavement." (Am. Compl. ¶ 11.) The surveillance video depicts this scenario as follows: Plaintiff's arrest was effectuated by several non-defendant officers over a period of

roughly fifteen seconds; during the first eight seconds, one non-defendant officer merely attempted to take Plaintiff by his right arm; then, after Plaintiff gave slight resistance, that same officer forcibly removed Plaintiff from the forklift and threw him onto the ground (all within a matter of two seconds), after which two other non-defendant officers came and helped pin Plaintiff on the ground. (Arrest Video [Dkt. # 55, Ex. 9].) No other officers were standing nearby during the critical moments when Plaintiff was removed from the forklift and thrown. (*Id.*)

Under these circumstances, it would be patently unreasonable to hold that Forgue and Romero had a realistic opportunity to intervene. They had only a few seconds to appreciate what was happening, let alone prevent the other officers from throwing Plaintiff to the ground within a narrow two-second window. Although Plaintiff broadly argues that they "should have known that the amount of force being used on [him] was excessive," (Pl.'s Br. [Dkt. # 65] at 19), the record is bereft of evidence that Forgue or Romero had any reason to assume the non-defendant officers would use any force at all in effectuating the arrest. Nor has Plaintiff cited any case law holding that bystander officers, such as Forgue and Romero, may be held liable for witnessing, but failing to prevent, (allegedly) excessive force that took place over a matter of seconds. Indeed, the Seventh Circuit has held the exact opposite. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) (finding as a matter of law that an officer had no way of intervening in another's use of excessive force where the window of opportunity was only a few seconds). Accordingly, no reasonable jury could find that Forgue and Romero had a reasonable opportunity to intervene under these circumstances, and the Court therefore grants judgment in favor of all Defendants on Count II.

## II.     Fourth Amendment Search and Seizure

Plaintiff next claims that Defendants violated his Fourth Amendment rights by entering and searching the surrounding warehouse, parking garage, and office without a warrant. The Fourth Amendment generally prohibits warrantless searches and seizures. *United States v. Starnes*, 741 F.3d 804, 807-08 (7th Cir. 2013). This rule applies to commercial premises as well as homes. *United States v. Hamad*, 809 F.3d 898, 904 (7th Cir. 2016) (citing, *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312 (1978). Business owners possess reasonable expectations of privacy in commercial property with respect to both traditional police searches and administrative inspections designed to enforce regulatory statutes. *New York v. Burger,* 482 U.S. 691, 699-700 (1987).

Defendants, however, insist that there is no evidence of their participation in the search, and that in any event, Plaintiff's Fourth Amendment rights were not violated in the first instance, because (1) he had no expectation of privacy in a commercial setting and (2) the "search" itself was merely a protective sweep made to ensure the officers' safety. Defendants are correct about the lack of evidence insofar as Officers Salgado and Romero are concerned, but there remain triable issues regarding Lieutenant Forgue's liability.

### (A)     Officers Salgado and Romero

Much like Count II, there is simply nothing in the record to suggest that Officers Salgado and Romero participated in the search, which places them beyond the ambit of Plaintiff's Fourth Amendment claim. *See Gossmeyer v. McDonald*, 128 F.3d 481, 493-96 (7th Cir. 1997) (holding that bystander officers who did not participate in a search could not be held liable for any Fourth

Amendment violations).[5] Plaintiff admits as much with respect to Officer Salgado, (*see* Pl.'s Br. [Dkt. # 65] at 16), so the Court grants judgment in his favor on Count VI. Still, Plaintiff maintains that Officer Romero may be held liable as a supervisor regardless of his involvement in the search. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (explaining that supervisors may be held liable for the conduct of subordinates under Section 1983 if they order, participate in, or otherwise turn a blind eye to unconstitutional conduct). Yet the evidence of Romero's supervisory role is entirely lacking.

Plaintiff cites to three portions of the record to support his argument: a 68-page hearing transcript from Plaintiff's criminal trial, Officer Romero's deposition, and Lieutenant Forgue's deposition. (*See* Pl.'s Facts [Dkt. # 66] ¶ 16.) The Court will not consider the transcript, however, since Plaintiff fails to pin cite any portion of it, which violates Local Rule 56.1's requirement that a party "make specific reference" to supporting exhibits. *See* L.R. 56.1; *see also Jeralds v. Astrue*, 754 F. Supp. 2d 984, 985 (N.D. Ill. 2010) (explaining that judges are not "archaeologists searching for treasure" in a party's presentation of the record). Turning to the cited portions of Romero's and Forgue's depositions, they do not establish that Romero was a supervisor. Quite the contrary: Romero's testimony reflects that he was a patrolman at the time, (*see* Pl.'s Resp. Defs.' Facts [Dkt. # 66] ¶ 16 (citing Romero Dep. at 51:4-54:12)), which Defendants note is the lowest rank in the Chicago Police Department. Accordingly, because it is undisputed that Officer Romero did not take part in the search, (*see* Defs.' Facts [Dkt. # 55] ¶

---

[5] It is possible that bystander officers can be held liable for their failure to intervene, *see Chavez v. Ill. State Police*, 251 F.3d 612, 651-52 (7th Cir. 2001), but the complaint does not allege this theory of liability.

35),[6] and Plaintiff has provided no other evidence to suggest he was a supervisor, there is no basis to find Officer Romero liable for violating Plaintiff's Fourth Amendment rights. The Court therefore grants judgment on Count VI in Officer Romero's favor as well.

### (B)    Lieutenant Forgue

Lieutenant Forgue presents a different story. As a threshold matter, Defendants do not dispute or otherwise respond to Plaintiff's argument that Lieutenant Forgue supervised the operation. Thus, drawing every reasonable inference in Plaintiff's favor, the Court will proceed with the analysis assuming that Forgue was indeed a supervisor. (His Lieutenant rank and testimony suggest as much, *see, e.g.,* Forgue Dep. [Dkt. # 55, Ex. 2] at 40:1-42:24 (indicating that after conferring with his commander, he was given authority to run the investigation and that he supervised some Chicago police officers to that end).) The question, then, is whether a search warrant should have been obtained before searching Plaintiff's business, which turns on (1) whether Plaintiff had any reasonable expectation of privacy, and (2) whether Defendants' search was otherwise justified as a protective sweep.

### (i)    *Plaintiff's Expectation of Privacy*

Defendants offer two grounds for finding that Plaintiff had no expectation of privacy in his place of business. First, they assert that Chicago Municipal Code Section 4-4-290 granted them authority to enter and search Plaintiff's business to ensure compliance with the Code's licensing provisions. Second, they argue that the only places searched were held open to the

---

[6] Plaintiff technically denies this fact, but the evidence he cites is self-defeating. (*See, e.g.,* Pl.'s Resp. Defs.' Facts [Dkt. # 64] ¶ 35) (citing Romero Dep. [Dkt. #55] Ex. 3 at 59:13-60:20) ("Q: Did you search the building? A: No. Q: Okay, did you search any part of the building? A: I didn't."). So Defendants' paragraph 35 is deemed admitted. The Court further notes that Plaintiff improperly cites to Defendants' Exhibit 18 at 59:20, which does not exist. The context of Plaintiff's denial, however, suggests that he intended to cite to Defendants' Exhibit 3, which is Romero's deposition.

public and therefore beyond the scope of Fourth Amendment protections. Neither argument succeeds.

The search in the case at bar was not an administrative inspection of commercial premises in a closely regulated industry by City inspectors. This was a criminal investigation by Chicago and other law enforcement officers for the purpose of enforcing criminal drug trafficking laws. Even assuming that Section 4-4-290 applies to the police activities (rather than investigators within Chicago's Department of Business Affairs and Consumer Protection, as suggested by the regulation itself, *see* Chi. Mun. Code § 4-4-290), Defendants have not explained how it authorized any conduct beyond inspecting Plaintiff's business license. Nor could they: nothing in Section 4-4-290 purports to grant police officers the authority to conduct warrantless searches without probable cause. *See Dkclm, Ltd. v. Cnty. of Milwaukee*, 794 F.3d 713, 715 (7th Cir. 2015); *Salem Bros. v. Corcoran*, No. 99 C 8228, 2000 U.S. Dist. LEXIS 11435, at *8 (N.D. Ill. July 27, 2000) (similarly rejecting the argument that Section 4-4-290 provides the police with such authority and instead applying a constitutional Fourth Amendment analysis). Accordingly, Defendants' reliance on the Chicago Municipal Code is misplaced.

With respect to Defendants second argument, they are correct in a limited sense: it is well-settled that law enforcement officers, like any member of the public, may enter commercial premises that are expressly or impliedly held open to customers or other members of the public. *See United States v. Sandoval-Vasquez*, 435 F.3d 739, 743 (7th Cir. 2006). Thus, Defendants' *entry* into Plaintiff's parking lot, office, and warehouse (the door of which was wide open upon Plaintiff's arrest), did not violate his Fourth Amendment Rights, since the parking lot and office were presumably held open to the public, and any entry into the warehouse was, at worst, trespassing. *See id.; United States v. Tolar*, 268 F.3d 530, 532 (7th Cir. 2001) (explaining that

"an open gate invites entry [by the police]" and that merely trespassing onto commercial premises by the police cannot ground a Fourth Amendment violation).

Had the entry and plain view inspection been all that the officers did, the discussion would end here. But the officers did more than enter: the surveillance video plainly shows, for example, certain officers searching small boxes — some of them sealed with tape — in the parking garage and warehouse. (*See, e.g.,* Warehouse Video [Dkt. # 55, Ex. 11] at 1:30:00-1:39:55). Plaintiff likely had a legitimate expectation of privacy in the contents of those packages, and a warrant was required to search them. *See Tolar,* 268 F.3d at 532 (explaining that in contrast to simply observing or passing through a portion of a commercial business open to the public, police officers would need "a warrant or equivalent order to . . . open containers . . . or otherwise investigate aspects of [the business] that the public could not observe"). Defendants' argument that Plaintiff's privacy rights were not implicated by the search is therefore a nonstarter.

(ii)    *The Protective Sweep*

Still, the issue remains whether the admittedly warrantless search was otherwise justified as a protective sweep, which is a well-established exception to the warrant requirement. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "A 'protective sweep' is a quick and limited search of premises, incident to arrest conducted to protect the safety of police officers or others." *Id.* The Fourth Amendment permits a protective sweep "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* (internal citations omitted). A protective sweep is "aimed at protecting the arresting officers," and the search is limited to a

cursory inspection into spaces where other assailants may be hiding and must not last "longer than is necessary to dispel the reasonable suspicion of danger." *United States v. Henderson*, 748 F.3d 788, 791 (7th Cir. 2014) (citing *id.* at 335-36).

Under this standard, a jury could find that the search went well beyond a mere protective sweep and thereby infringed Plaintiff's Fourth Amendment rights. An analysis of the video shows that the purported protective sweep lasted for almost twenty minutes, which a jury could find is uncharacteristically long for a protective sweep under these circumstances. *See United States v. Burrows*, 48 F.3d 1011, 1017 n.9 (1995) ("[A] protective sweep may not last longer than the time it takes to complete the arrest and depart the premises."); *cf. United States v. Contreras*, 820 F.3d 255, 269 (7th Cir. 2016) (upholding a protective sweep that lasted "less than a minute"); *Starnes*, 741 F.3d at 808-09 (upholding a protective sweep where the officers "looked briefly" into the premises, vacated the area once the defendant was secured, and waited outside to conduct another search until a warrant was obtained).

Moreover, as noted above, the videos further reflect the following: during the warehouse search, an unidentified officer walked around and (seemingly at random) ripped the tape off of a small, sealed cardboard box and looked inside, (Warehouse Video [Dkt. # 55, Ex. 11] at 1:33:37-1:33:41); during the parking lot search, another unidentified officer similarly appears to have opened yet another small box and searched inside, (Parking Lot Video [Dkt. # 55, Ex. 10] at 1:28:30-1:35:17); and lastly, during the search of the office, the video shows an officer in a red hat rummaging through closed desk drawers, taking out a small blue box, and searching it, (Parking Lot Video [Dkt. # 55, Ex. 10] at 1:28:30-1:35:17). A jury could conclude that these were arbitrary searches for contraband unrelated to the officers' safety. *See Buie*, 494 U.S. at 335-36 (explaining that the search must be cursory and limited to visual inspection of places

where persons might be hiding); *cf. Contreras*, 820 F.3d at 269 (upholding a protective sweep where "[t]he officers did not search any drawers, containers, or other places for evidence, but merely looked for people so that they could ensure officer safety"). For these reasons the Fourth Amendment search and seizure claim as to Lieutenant Forgue must go to the jury.

      **(C)**    **Qualified Immunity**

Finally, Defendants argue that regardless of the merits of Plaintiff's Fourth Amendment claim, they are entitled to qualified immunity. But this argument is easily dismissed. Although qualified immunity generally shields police officers such as Lieutenant Forgue from liability for their official acts, it does not apply if an officer violates a clearly established constitutional right. *See Stainback v. Dixon*, 569 F.3d 767, 770 (7th Cir. 2009). Defendants argue that Plaintiff's rights were not clearly established. Not so. The Fourth Amendment has been consistently interpreted to proscribe warrantless searches, and the permissible scope of protective sweeps in particular has been clearly established since *Maryland v. Buie*, 494 U.S. 325 (1990). Defendants' motion for summary judgment on their affirmative defense of qualified immunity on Count VI is therefore denied.

## III.    Malicious Prosecution

Under Illinois law, malicious prosecution has five elements: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. *Swick v. Liautaud*, 662 N.E.2d 1238, 1242, 215 (Ill. 1996); *Saunders-El*, 778 F.3d at 561.

To that end, the complaint alleges broadly that Defendants wrongfully charged him with resisting arrest and marijuana possession, but Plaintiff's briefing suggests that his theories of

liability for each charge diverge somewhat. Concerning the resisting arrest charge, Plaintiff asserts that although it was initiated by a non-defendant officer, Lieutenant Forgue and Officer Romero may be held liable because of their supervisory roles, since they "were in a position to observe that [Plaintiff] did not offer any resistance to the arrest" and were therefore "complicit, individually and together, in initiating and continuing the prosecution." (Pl.'s Br. [Dkt. # 65] at 8.) Similarly, concerning the marijuana possession charge, Plaintiff maintains that while Officers Salgado and Romero were not responsible for filing the charge, they may be held liable because they actively encouraged the prosecution by fabricating evidence of Plaintiff's criminal intent. (*Id.*) Defendants, however, insist that both claims necessarily fail for the same reasons: (1) none of the Officer Defendants formally "commenced or continued" the charges against Plaintiff, and (2) probable cause existed for both charges.

(**A**)    *Commencing/Continuing Judicial Proceedings*

(i)    Resisting Arrest

Defendants are correct regarding the resisting arrest charge. The complaining officer for that charge was Officer Bratton, a nondefendant officer from the SVPD. (*See* Misdemeanor Compl. [Dkt. # 55, Ex. 8] at 1.) The extent of Officer Romero's involvement in this charge was tangential at best: he prepared the initial arrest report, nothing more, (*see* Pl.'s Resp. Defs.' Facts [Dkt. # 64] ¶ 47), and the report itself contains no suggestion that Plaintiff resisted arrest and lists only Officer Bratton as the complainant for that charge, (*see* Arrest Report [Dkt. # 55, Ex. 7] at 1). There is thus no sense in which Romero commenced or continued the resisting arrest charge. *See McDade v. Stacker*, 106 F. App'x 471, 475 (7th Cir. 2004) (holding that in order to maintain a malicious prosecution suit against arresting officers, a plaintiff must show that the officers'

conduct influenced the decision to prosecute). Nor is there anything in the record to suggest that Lieutenant Forgue authored any reports or otherwise played a role in initiating the charge.

Plaintiff's appeal to the Officers' supervisory roles does not save him in this instance. As discussed in the preceding section, Officer Romero was a patrolman at the time, not a supervisor. And even assuming that Lieutenant Forgue supervised *the operation*, the resisting arrest charge arose because a nondefendant officer outside of Forgue's unit and from another municipality signed a misdemeanor complaint. Accordingly, because Plaintiff has not pointed to any facts suggesting that Forgue supervised Officer Bratton in this capacity or otherwise influenced his decision to initiate the resisting arrest charge, the Court finds that both Forgue and Romero are entitled to judgment on this aspect of Plaintiff's malicious prosecution claim.[7]

(ii)     Marijuana Possession

Whether Officers Salgado and Romero "commenced or continued" the marijuana possession charge is unclear. Plaintiff claims that they took an active role in the prosecution by preparing a supplementary police report eight months after Plaintiff's arrest, which (1) contained a (false) admission that he was paid by Tom Li to receive packages, and (2) served as the primary evidence of Plaintiff's criminal intent for the marijuana possession charge. This is precisely the sort of additional involvement/misconduct that may subject arresting officers to liability for malicious prosecution. *See McDade*, 106 F. App'x at 475.

Defendants, of course, disagree: they argue that the report could not have caused the charges to be commenced or continued because the prosecutor took the case to trial even after the admission in the report was suppressed. But at the suppression hearing, Officer Romero explained that he authored the supplementary report at the request of the State's Attorney's

_____

[7] Plaintiff does not claim that Officer Salgado had anything to do with this charge, so he is entitled to judgment as well.

Office. (Suppression Hr'g Tr. [Dkt. # 55, Ex. 19] at 34-35.) This is significant because it is undisputed that none of the prior reports contained any statements by Plaintiff whatsoever, which means the supplementary report could have entered into the State Attorney's decision to indict Plaintiff in the first instance; and could have been what caused the States Attorney to conclude that Plaintiff was, in fact guilty, and should be prosecuted. That Plaintiff's statements were ultimately suppressed before trial is therefore not determinative of whether the supplementary report played a role in commencing and/or continuing the prosecution of criminal charges.

(**B**)    *Probable Cause*

Probable cause is defined as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chi.*, 733 F.3d 749, 759 (7th Cir. 2013) (citing *Gauger v. Hendle*, 954 N.E.2d 307, 329-30 (Ill. App. Ct. 2011). Here, Defendants make much of the facts and circumstances at the time of Plaintiff's arrest, but the record is in conflict as to what exactly happened at the scene. Officer Romero could not recall some important parts of the conversation at the time of his deposition. Apparently some of what the officers said was translated from English to Chinese and by the secretary, and some of Plaintiff's responses were in turn translated from Chinese to English. Because the events at the time of arrest are uncertain, the issue of probable cause at the time of arrest must go to the jury.

In addition, the existence of probable cause may change as a case evolves. *See Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1061 (N.D. Ill. 2015) (holding that even if probable cause exists to *arrest* a defendant, state actors may still be liable for malicious prosecution if they take an active part in the prosecution *after* learning that probable cause is lacking). Thus, even assuming that Officers Salgado and Romero initially and honestly believed that Plaintiff had

committed a crime, a jury could infer from their subsequent, plausible role in fabricating evidence of Plaintiff's criminal intent that they knew probable cause was lacking yet encouraged the prosecution anyway.[8] Accordingly, the Court declines to grant judgment in favor of Salgado and Romero on Count I.[9]

## IV. Conspiracy

Next, Defendants argue that Plaintiff's conspiracy claim necessarily fails because (1) it is barred by the intra-corporate conspiracy doctrine, which holds that a conspiracy cannot exist solely between members of the same entity, *see Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994), and (2) there is no evidence of to support the existence of a conspiracy. Neither argument is availing.

First, the intra-corporate conspiracy doctrine. Under the doctrine, employees of a corporation who jointly pursue its lawful business do not become "conspirators" when acts within the scope of their employment are said to be discriminatory or retaliatory. *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990). The policy behind the doctrine is to preserve independent decisionmaking by business entities and their agents, free of the pressure that can be generated by allegations of conspiracy. *Id.* In this case, however, there are no similar policy concerns that would justify applying the doctrine: Plaintiff claims that Defendants conspired to maliciously prosecute him, for example by fabricating police reports. If true, such actions are neither "routine" nor ones that should be shielded from liability simply

---

[8] Defendants note at one point in their brief that Illinois law shields police officers from liability for malicious prosecution so long as their conduct was not willful or wanton. (Defs.' Br. [Dkt. # 54] at 7) (citing 745 Ill. Comp. Stat. § 10/2-202). But it goes without saying that fabricating evidence is a willful act, so this argument fails as well.

[9] Plaintiff's briefing does not suggest that Lieutenant Forgue fabricated any evidence or otherwise "encouraged" the prosecution to move forward with the marijuana charge, so he is entitled to judgment on this aspect of Plaintiff's malicious prosecution claim as well.

because they were made collaboratively within a police department. Moreover, although the Seventh Circuit has not opined on this issue, a substantial number of courts in this district have categorically refused to apply the doctrine to Section 1983 claims of police misconduct. *See Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1085 (N.D. Ill. 2015) (cataloguing cases, detailing the split of authority, and concluding that the majority of courts in this district refuse to expand the doctrine to police misconduct because misconduct, by its very nature, is "not the product of routine police department decisionmaking"). This Court will follow suit, and the intra-corporate conspiracy doctrine accordingly poses no obstacle to Plaintiff's conspiracy claim.[10]

Turning to the substance of Count IV, Defendants claim that Plaintiff has offered no evidence that would support the traditional elements of a conspiracy; namely, (1) an agreement between two or more persons to deprive the plaintiff of his constitutional rights, and (2) an overt act in furtherance of that agreement, *Washington v. Amatore*, 781 F. Supp. 2d 718, 720 (N.D. Ill. 2011). But an express agreement among the conspirators is not necessary; the participants must simply share the same general conspiratorial objective. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). Indeed, direct proof of such an agreement is rarely available, since conspiracies are by their very nature secretive; thus, the existence of a conspiracy may be inferred through the combination of common sense and circumstantial evidence. *See Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015).

---

[10] This conclusion is further supported by considering the Seventh Circuit's treatment of similar issues, as in *Geinosky v. City of Chi.*, 675 F.3d 743 (7th Cir. 2012). There, the plaintiff alleged that eight Chicago police officers violated his equal protection rights by giving him more than twenty illegitimate parking tickets. In addition to his equal protection claim, the plaintiff also alleged a civil conspiracy among the officers. *Id.* at 746. The district court dismissed both claims, but the Seventh Circuit reversed. *Id.* Significantly, in allowing the conspiracy claims against the officers to go forward, the Seventh Circuit made no mention of the intercorporate conspiracy doctrine, nor did it suggest that there was any general legal bar to a claim that a group of police officers formed a conspiracy to violate a person's constitutional rights. *Id.* at 749-50.

In this case, a reasonable jury could conclude that Officers Salgado and Romero conspired to maliciously prosecute Plaintiff by virtue of their plausible role in fabricating the supplementary report. Consider the following. The report quotes Plaintiff as stating "I get paid $1500 for each package that I have received with the name being addressed Tom Li. This was my second time doing this for Tom Li." (Supplementary Report [Dkt. # 55-4, Ex. 17] at 1.) Plaintiff, however, maintains that he is unable to understand or speak English conversationally,[11] so it is unclear whether he would have been able to understand any questions, much less articulate the above statement.

Of course, there is the possibility that Officer Salgado translated the statement, since, as Defendants note, he interrogated Plaintiff with a mix of Chinese and English. But there is a critical, unresolved issue in this regard: during the suppression hearing, Officer Salgado attempted to explain the conversation he claimed to have had with Plaintiff in Chinese, but a court-certified Chinese translator informed the judge that he was unable to understand what Salgado was trying to say. (*See* Defs.' Resp. Pl.'s Facts [Dkt. # 71] ¶ 28.) This suggests that Salgado's Chinese was incomprehensible. A jury could thus consider (1) Plaintiff's alleged inability to understand English, (2) Officer Salgado's apparent inability to speak Chinese, and (3) both the clarity of the statement in the supplementary report and its curious timing (i.e., appearing for the first time eight months after the arrest — at the behest of the prosecutor), and

---

[11] Defendants insist otherwise, but the evidence they rely upon merely suggests that Plaintiff may have *some* rudimentary grasp of English. Particularly, Defendants note that Plaintiff answered one question at his deposition without the use of a translator, and that he further testified to being able to read certain business bills in English. (*See* Defs.' Resp. Pl's Facts [Dkt. # 71] ¶ 1.) But neither point demonstrates to what extent Plaintiff can understand English, so this is ultimately a question of credibility that must go to the jury.

conclude that the report was a joint effort between Salgado and Romero to prop up a weak criminal case with a fabricated report. This dooms their argument for judgment on Count IV.[12]

## V.     Intentional Infliction of Emotional Distress ("IIED")

The Supreme Court of Illinois has set forth three requirements necessary to demonstrate the intentional infliction of emotional distress: (1) the conduct involved must be extreme and outrageous; (2) the actor must have intended such distress or been aware of a high probability of causing it; and (3) the conduct, in fact, must have caused the plaintiff to suffer severe emotional distress. *Feltmeier v. Feltmeier,* 798 N.E.2d 75, 80 (2003). Here, while the complaint alleges broadly that "the acts" of the Officer Defendants caused Plaintiff extreme emotional distress, the only colorable claim he may have for IIED stems from his allegations of evidence fabrication.[13] But it is one that must go the jury.

### (A)     *Extreme/Outrageous Conduct*

To qualify as "extreme and outrageous," the nature of the defendant's conduct must go beyond all possible bounds of decency and be regarded as intolerable in a civilized community. *Id.* The extreme and outrageous character of the conduct, moreover, can be evidenced by the abuse of a position of power, such as those by the police. *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994). Whether a defendant's conduct is indeed "extreme and

---

[12] Plaintiff has failed to provide any evidence of Lieutenant Forgue's involvement, however, so he is entitled to judgment in this respect.

[13] Plaintiff's brief focuses on several other aspects of the Officers' conduct to ground his IIED claim: (1) the Officers' use of excessive force; (2) the stress of being investigated, arrested, and interrogated; and (3) the Officers' allegedly false testimony against him. None of these is availing. The Court has already determined that Plaintiff has no claim for excessive force against Defendants, so it cannot ground his IIED claim. Furthermore, Illinois courts have held as a matter of law that "there is nothing inherently extreme and outrageous about [the police] conducting investigations or questioning [a suspect]," and Plaintiff has not provided any evidence of extreme and outrageous investigation/interrogation tactics. Lastly, police officers are immune from liability for any testimony given at trial. *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 274 (Ill. App. Ct. 2002).

outrageous" generally must be evaluated by the jury based on all of the facts and circumstances. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 606 (7th Cir. 2006). Without taking a position on the merits, the Court finds it plausible that a civilized community could regard the fabrication of evidence by police officers (who exercise significant power over civilians) as outrageous and extreme. The Court therefore declines Defendants' invitation to take this issue from the jury.[14]

**(B)** *Intent and Probability*

The tort's second element inquires as to whether the actor either intended that his conduct inflict severe emotional distress or knew that there was at least a high probability that his conduct would do so. *Honaker v. Smith,* 256 F.3d 477, 494 (7th Cir. 2001). Courts have generally found this element to be satisfied when a defendant's actions, by their very nature, were likely to cause severe distress. *Id.* Here, Officers Salgado and Romero presumably were familiar with the stress typically faced by defendants throughout the criminal process, particularly the threat of jail time. And a jury might well conclude that Salgado and Romero knew that exposing an undeserving citizen to the threat of jail, by propping up a weak criminal case with fabricated evidence, necessarily carried a high probability of causing severe emotional trauma.

**(C)** *Severity of the Distress*

---

[14] Defendants cite *Ali v. Wal-Mart Stores, Inc.*, No. 04 C 7930, 2005 WL 2318905, at *3 (N.D. Ill. Sept. 21, 2005) for the principle that fabricating evidence does not qualify as "extreme" or "outrageous," but *Ali* is distinguishable for several reasons. Above all, there were no allegations of evidence fabrication in *Ali*; rather, the plaintiff sued a Wal-Mart security guard (who reported the plaintiff for shoplifting) because the security guard did not actually see him steal anything. *Id.* at *3. While the security guard indeed prepared a "loss prevention report," which was given to the police, nothing in *Ali* suggests that the report was fabricated or otherwise the subject of the plaintiff's IIED claim. *Id.* Police officers, moreover, exercise significantly more power over civilians than private security guards, and, in any event, causing someone to be arrested (as the security guard did in *Ali*) is arguably a different sort of harm than causing someone to be indicted and possibly convicted (as Defendants allegedly did).

The third element focuses on the severity of the emotional distress. *Id.* To that end, Plaintiff claims that he panics when he sees or hears emergency vehicles, feels disgraced in his social and professional communities, and suffers from depression, anxiety, suicidal thoughts, insomnia, bad dreams, fear of deportation, and fits of crying. (Pl.'s Resp. Defs.' Facts [Dkt. # 64] ¶¶ 55-56.) (He has admittedly never sought treatment for these disorders, however, *see* Pl.'s Br. [Dkt. # 65] at 14.) Yet even assuming the truth of these claims, Defendants maintain that this sort of "garden variety" mental distress is insufficient as a matter of law, and that Plaintiff's failure to seek treatment and establish a concrete disorder is fatal to his claims on summary judgment. Yet here, too, the issue must go to the jury.

As explained by the Seventh Circuit:

> In recent years, Illinois courts have delineated with some precision the type of emotional distress that is sufficiently severe to meet the law's requirements. More specifically, when plaintiffs have complained that a defendant's actions caused them simply to become annoyed, frustrated, stressful, distressed, embarrassed, humiliated or nervous, those plaintiffs have been found not to have stated a claim under Illinois law. In contrast, when the distress has manifested itself either through physical symptoms or has necessitated medical treatment, Illinois courts have been more inclined to characterize the emotional distress as severe. Yet neither physical injury nor the need for medical treatment is a necessary prerequisite to establishing severe emotional distress. [citations omitted]

*Honaker,* 256 F.3d at 494. Even where a plaintiff had no physical manifestation of the emotional distress and did not seek medical treatment, some courts have still found that he could establish severe emotional distress. *See Amato v. Greenquist,* 679 N.E.2d 446, 455, (Ill. App. Ct. 1997) (finding allegations of depression, despair, insomnia, anxiety, and nervousness sufficient to state a claim for IIED). Additionally, other Illinois courts have held that although severe emotional distress must ultimately be proven, the more outrageous nature of the conduct involved, the less evidence of actual severe distress is necessary. *See Honaker,* 256 F.3d at 496 (cataloguing cases).

Taken together, these principles militate in favor of presenting Plaintiff's claims of emotion distress to the jury, and so Defendants' motion for summary judgment on Plaintiff's IIED claim is denied with respect to Officers Salgado and Romero. *See Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 804 (N.D. Ill. 2013) (permitting and IIED claim to proceed where the plaintiff alleged distress caused by fabricated evidence). Lieutenant Forgue, however, is again entitled to judgment on Count III because nothing in the record suggests that he was involved in fabricating any evidence.

## CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Defendants' motion for summary judgment [54]. The Court grants judgment on Count II (excessive force) in favor of all Defendants. With respect to Count I (malicious prosecution), Count III (IIED), and Count IV (conspiracy), the Court grants judgment in favor of Lieutenant Forgue only. With respect to Count VI (unreasonable search/seizure), the Court grant judgment in favor of Officers Romero and Salgado. Plaintiff is entitled to a trial on his remaining claims. A status hearing is set for November 10, 2016 at 9:30 a.m. to set a trial date and resolve any remaining issues.

**SO ORDERED.**                                    **ENTERED:** October 24, 2016

**HON. RONALD A. GUZMÁN**
**United States District Judge**